UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Todd **KREISLER**,

      Plaintiff,
   v.

Kais **ABID**,
*d/b/a PAPA JOHN'S;*
**KAM FOUR INC**,
*A New York Corporation d/b/a/ Papa John's,*
**PARKER EAST 24TH APARTMENTS LLC**,
*A New York Limited Liability Company;*
**PARKER COMMERCIAL 24TH ASSOCIATES**,
*A New York Limited Partnership,*
**305 EAST 24TH OWNERS CORP**.,
*A New York Corporation*
      Defendants.

**12 civ. 4052 (PAE)**

**REPLY TO MOTION**
(Response to Dkt. #74)

TO:   Adam Shore, Esq.
     Atty for Plaintiff
     100 Park Avenue STE 1600
     New York NY 10007-5538

     Gary Ehrlich, Esq.
     Atty for Defendant 305 E 24 Owners Corp
     49 West 37 Street  FL 7
     New York NY 10018-0182

     John Egan
     Seyfarth Shaw LLP
     620 Eighth Avenue
     New York NY 10018-1595

Served via ECF filing

1. Kais **ABID**, by his attorney Barry Frank Esq., files this Opposition to the Motion filed by Parker East 24th Apartments LLC (hereinafter, **PARKER EAST**) (Dkt.74.)

*As we have previously noted, there is case law on point which indicates this case is now moot. Should the Court wish to be further briefed on that matter prior to ruling on the instant Motion, we would of course promptly submit a detailed brief.*

*The Movant raises issues which arguably require determination of the existence (or lack thereof) of an attorney-client relationship. Such determination would involve the application of New York law, and while we address certain specific aspects herein, we would provide such further briefing as this Court would deem necessary.*

### SUMMARY OF THIS AFFIRMATION

2. That portion of Movant's argument denominated as "double dipping" is properly viewed under the doctrines of *res judicata* and collateral estoppel.

3. As such that portion of the instant Motion is properly denied on grounds of standing, but may be raised as an affirmative defense in any Answer filed by the (newly-named) Parker 24 defendant.

4. Movant's motion for vacatur necessarily implicates the doctrines of

   a. waiver,

   b. estoppel, and

   c. alter ego theory.

5. Movant does not present an argument for or against the application of any of the doctrines, but this Court may properly deny vacatur based on any of those grounds, particularly alter ego.

6.  However, the Motion may be properly granted on grounds not raised by Movant.

7.  Movant's motion for vacatur are dependent on self-serving assertions against an attorney who is not before the Court.

8.  Those assertions are properly analyzed in accordance with the Judiciary Law of the State of New York, relevant case law, and relevant Tri Bar opinions.

9.  As such, if this Court does wish to consider the self-serving assertions, it would be appropriate to hold a hearing on the record with all parties able to cross-examine the person making the assertions and the person against whom they are being made, with this Court determining the credibility and ruling in accordance therewith.

10. The Movant's motion should be granted <u>to the extent</u> the Court's order relating to an award of attorney fees pursuant to a fee-shifting statute conflicts with U.S. Supreme Court case law on point; although Movant has apparently no knowledge of the particular case and fails to raise the issue in his pleading, this Court is bound by Supreme Court case law on point.

11. That portion of Movant's argument relating to 2 emails should be determined based on one (or more) of 3 possible frameworks:

    a.  Attorney-client privilege,

    b.  Common-interest doctrine,

    c.  FRE 408

12. Using any of those 3 frameworks, the emails are properly placed in the publicly-available record in this case.

**A**LTHOUGH **M**OVANT **F**AILS **T**O **S**HOW **G**ROUNDS **F**OR **V**ACATUR *I**N* *T**OTO*, **M**OVANT **R**AISES **M**ATTERS **O**F *R**ES** **J**UDICATA* **A**ND **C**OLLATERAL **E**STOPPEL **M**ORE **P**ROPERLY **R**AISED **A**S **A**N **A**FFIRMATIVE **D**EFENSE **T**O **T**HE **S**ECOND **A**MENDED **C**OMPLAINT

13. The Affidavit in Support (Dkt. 76) and Memorandum of Law (Dkt. 77) filed by **PARKER EAST** border on the designedly obfuscatory, bringing to mind Socrates: "we got into a labyrinth, and when we thought we were at the end, came out again at the beginning, having still to seek as much as ever", PLATO, EUTHYDEMUS.

14. For that reason, it is necessary to begin by addressing threshold issues which the Movant chooses to ignore, but this Court must address: *res judicata* and collateral estoppel.

15. Just a few months ago, Judge Forrest noted that:

> Res judicata bars new claims out of the same transactions regardless of whether they are winners or losers. A party's second bite at the apple may well be successful. It will be barred under res judicata because the party already had one bite at the apple; not because the second bite would necessarily taste the same (or be decided the same way) as the first, *Mahmood v. Research in Motion*, 2012 WL 5278470 at *3 (S.D.N.Y. 2012)

16. In the instant case,

   a. Plaintiff sued Landlord,
   b. as a result of a wrong committed, and
   c. obtained a judgment against Landlord, and
   d. has collected on that judgment.

17. Now with the Second Amended Complaint,

   a. Plaintiff sues Landlord,
   b. as a result of a wrong committed,
   c. seeking judgment against Landlord.

18. The only way in which Plaintiff's claim is not barred by *res judicata* is if the wrong committed is different.

19. It is not.

20. Even counsel for the Parker entities admits that this is "a duplicative claim against the landlord" (Dkt. 77 at page 13).

21. Given that the judgment amount is only for $1000 in damages *(which has been paid to—and accepted by—the Plaintiff)* and $7,073.17 in attorney fees, the obvious question is why counsel does not simply move to dismiss the newly-named entity on *res judicata* grounds.

22. It is notable that counsel does not even whisper the words "*res judicata*".

23. Parker's Memorandum of law claims that "denial of this motion would allow Plaintiff to double dip by pursuing a second recovery from the landlord of the premises," (Dkt. 77 at page 7 of 19, a/k/a numbered page 3 of Memo).

24. As any fan of Seinfeld is aware, double dipping is bad form, [Seinfeld, The Implant](#) (Season 4, episode 19, aired Feb. 25, 1993).

25. Notwithstanding matters of double-dip etiquette, the doctrines of *res judicata* and collateral estoppel apply in all courtrooms of the S.D.N.Y., not simply in Judge Forrest's court.

26. All of Judge Forrest's criteria are met for a simple (and cost-effective) assertion of collateral estoppel:

    a. The issue is identical to the one actually litigated,
    b. Actually decided,
    c. Necessary to the holding in a previous action,
    d. The party against whom collateral estoppel is asserted must have also had a full and fair opportunity to litigate the issue, *Mahmood* at *3

27. Not only did plaintiff Kreisler have a full and fair opportunity, he got every single bit of relief he demanded (less a deduction for eight-tenths of an attorney fee hour).

28. While the State of New York does not recognize a homoousian business entity structure such as the one which Movant apparently is asserting in his January 2 letter, collateral estoppel only requires that the party *against whom estoppel is asserted* have had substantive due process.

29. As such, whatever Parker entity is ultimately determined to be the true landlord, collateral estoppel can be asserted by the Movant (in whichever emanation it is named as Defendant) against plaintiff Kreisler.

30. A cynical observer might suspect that a defaulted party subsequently attending multiple "settlement" conferences and drafting brobdingnagian pleadings to reopen litigation rather than pay $7,037.17 is for a purpose other than the ostensible one set forth in the Motion.

31. The claim that "the Court should also consider Parker East's diligence in the defense of this matter," (Dkt. 77 page 7/19, numbered page 3) is a valid one.

32. A judgment of default was issued on Dec. 11.

33. According to Movant, retention of counsel was "finalized" on Dec. 18, just a week after the default. (Dkt. 75 at ¶ 4)

34. Movant's counsel sent a letter to counsel for Abid on Jan.3 (Dkt. 54-3), but did not file anything with this Court.

35. Movant's counsel subsequently appeared at a 2 settlement conferences despite the fact that Movant was no longer a party to the case.

36. As we have previously noted in our pleadings, there are several bases for asserting that the **$7,037.17 judgment** is not proper as a matter of law under the *Buckhannon* standard [*Buckhannon Board and Care Home Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598

(2001)]—even allowing that the **$1,000 judgment** is proper pursuant to *City of N.Y. v. Mickalis Pawn Shop LLC,* 645 F.3d 114, 137 (2d Cir. 2011), cited by this Court in a previous Order (Dkt. 63).

37. But although counsel for the Parker entities does not raise this issue, this Court may *sua sponte* reconsider its ruling should this Court deem said ruling to be inconsistent with Supreme Court case law.

## MOVANT'S CLAIM REGARDING THE EHRLICH E-MAIL (DKT. 76-8) IS CONTRARY TO THE PLAIN LANGUAGE, AND IN FACT NEGATES MOVANT'S CLAIM

38. We now turn to Movant's claim that "Defendant Abid's Attorney Represented to Ms. Wong that Defendant Abid Would Defend and Indemnify Parker East." (Dkt. 77 at p. 12/19, numbered page 8).

39. The Movant states (with emphasis in original):

> *Significantly, on November 12, 2012, Mr. Steinberg advised Ms. Wong on a conference call that Defendant Abid would defend and indemnify Parker East in this action.* [cite]. This discussion was confirmed in an e-mail authored by counsel for Defendant 305 East 24th Owners Corp. ("305 East"), who also participated in this conference call. [cite].

40. The email in question is at Dkt. 76-8, as Exhibit "H" to Dkt. 76.

41. The actual text of the email from counsel for 305 East is:

> I am following up on our previous conversation where we discussed your client taking over the defense of this action for all defendants and indemnifying the coop and its landlord. Please advise me if your client is willing to do so.

42. Movant states that a discussion was "**confirmed**" by a prior e-mail message from Ehrlich.

43. There are at least two possible meanings for "confirmed" in this statement.

44. One is that the Ehrlich e-mail confirmed the existence of the discussion.

45. A second, metonymic meaning is that the Ehrlich e-mail confirmed the content of the discussion (*i.e.*, that in the discussion "Mr. Steinberg advised Ms. Wong that Defendant Abid would defend and indemnify Parker East in this action".)

46. If the Ehrlich e-mail message above is the one that Movant is referencing, the message is more clearly designed to accomplish a shared understanding of the first meaning of "confirmed".

47. Not only is the message not noticeably designed to accomplish an understanding of the second meaning, Ehrlich has designed the message in a way that projects the understanding that the previous conversation did not result in a decision concerning the topic Ehrlich describes .

48. One way to accomplish "confirmation" in talk is for a speaker to offer a candidate understanding of a previous interaction or utterance and further design the interactional turn so that the next relevant action of the interlocutor is to confirm or reject that candidate understanding in the next adjacent turn at talk, G.H. LERNER, CONVERSATION ANALYSIS: STUDIES FROM THE FIRST GENERATION 227-234 (2004)

49. In this case Ehrlich does design the completion of the turn as a request that projects a preference for a response that will supply specific information ("if your client is willing to [take over defense of this action and indemnify the coop and landlord])", Emanuel A. Schegloff, *On the Organization of Sequences as a Source of 'Coherence' in Talk-in-Interaction*, in CONVERSATIONAL ORGANIZATION AND ITS DEVELOPMENT 51-77 (B. Dorval, ed. 1990), accord, Emanuel A. Schegloff, G. Jefferson & H. Sacks, *The Preference for Self-Correction in the Organisation of Repair in Conversation*, 53 LANGUAGE 361-382 (1977)

50. However, Ehrlich's preceding utterance does not offer a candidate understanding of a decision reached in the previous discussion.

51. It merely states that there was a discussion and offers a topic of the discussion.

52. In fact, the speaker has designed the utterance in a way that leaves open the likelihood that the previous discussion did not yield a decision.

53. Examples of how it could have been designed to display an understanding of a decision in the previous interaction include, "Please confirm that your client is willing to do so" or "Please advise me if you client is willing to do so, *as we agreed earlier*."

54. Although Ehrlich's message ends with a request that projects a preference for an affirmative or negative answer (e.g., "Yes/No, my client is willing/not willing…"), Steinberg's response does not display an orientation to an immediately prior request.

55. Steinberg's directions ("You can send the appropriate paperwork…") leave it to the recipient to infer whether this can be understood as an unambiguous answer or whether it constitutes an "answer" at all.

56. In other words, Steinberg leaves it to Ehrlich to determine if directing him "to send the appropriate paperwork for signature over to Barry Frank" means that Steinberg's client "is

   a. willing to [take over defense of this action and indemnify the coop and landlord]",
   b. means that the client is unwilling, or
   c. has no understandable implication in either direction.

57. It is up to the recipient, Ehrlich to use the next interactional turn to

   a. confirm an understanding of the answer,
   b.  re-issue the request if the answer is not understandable,
   c. end the pursuit of an answer, or

    d.    pursue a different action, H. Sacks ,Emanuel A. Schegloff, & G. Jefferson, *A Simplest Systematics for the Organization of Turn-Taking for Conversation*, 50 LANGUAGE 696-735 (1974)

58. The very fact that Mr. Ehrlich never sent any paperwork to Mr. Frank and that Mr. Ehrlich appeared on the next court date speaks for itself.

59. Ms. Wong does not assert that she or anyone in the legal department at any of the Parker entities even contacted Mr. Frank, let alone made any arrangements for representation.

60. With regard to Movant's assertion of attorney-client privilege, we would close by noting that when this Court recently ruled in a case on point, Judge Francis noted that "mere conclusory or ipse dixit assertions" were insufficient, *US. V. Ghavami*, 882 F.Supp.2d 532, 536 (2012), <u>citing</u> *In re Grand Jury Subpoena Dated Jan 4, 1984*, 750 F.2d 223, 224-25 (2d Cir. 1984).

61. Movant frames their claim of privilege in the context of actual representation, and this Court may properly rule narrowly on the basis that Movant asserts.

62. Should the Court wish, we can brief this issue in further detail.

## UNDER NEW YORK LAW, JOINT REPRESENTATION WOULD HAVE REQUIRED INFORMED, WRITTEN CONSENT

63. When analyzing a joint representation scenario, the starting point is NY Rule of Professional Conduct Rule 1.7.

64. The first prong of the Rule requires a self-evaluation by the attorney who would be engaging in the joint representation.

65. Since attorney Steinberg is not admitted to federal court, nor is he the litigation counsel in this matter, the first prong would have entailed an evaluation by attorney Frank.

66. Assuming arguendo that the first prong is met, the second prong entails 4 tests; the first 2 of which are not relevant to our inquiry.

67. Rule 1.7(b)(3) requires that joint representation not involve the assertion of a claim by one client against another client in the same proceeding. On that basis alone, joint representation would not have been permitted in this instance, since the Parker entities have always maintained they are claiming against Abid.

68. On a corollary note, the NYSBA Commentary to Rule 1.7 note 29A specifically says that "a lawyer cannot undertake common representation of clients where contentious litigation or negotiations between them are imminent or contemplated."

69. Without stirring up another FRE 408 brouhaha, suffice it to say that the Movant—having been dismissed from the case with the entry of a default judgment—chose to insert itself into settlement negotiations, and… we all see how that turned out.

70. Rule 1.7(b)(4) requires that each client "gives informed consent, in writing."

71. There was never any informed consent in writing. In fact, there was not even any contact with attorney Frank.

72. The New York definition of "informed consent" at Rule 1.0(j) mirrors ABA Rule 1.7(b). The New York definition is "agreement by a person to a proposed course of conduct after the lawyer has communicated information adequate for the person to make an informed decision, and after the lawyer has adequately explained to the person the material risks of the proposed course of conduct and reasonably available alternatives," THE NEW YORK RULES OF PROFESSIONAL CONDUCT 154 (NY Cty Lawyers Ethics Institute, eds.) (2011).

## MOVANT'S CLAIM REGARDING THE ALLEGED STEINBERG REPRESENTATION CONFLICTS WITH MOVANT'S POSITION REGARDING THE OCTOBER 12 E-MAIL

73. Movant claims that the October 12 email is protected by privilege since Abid and Movant were both represented by the same attorney.

74. As explained in the NYSBA Commentary at note 30: "With regard to the attorney-client privilege, the prevailing rule is that, as between commonly represented clients, the privilege does not attach."

75. As explained in Commentary note 29:

> A lawyer should consult with each client concerning the implications of the common representation, including the advantages and risks involved, and the effect on the attorney-client privilege, and obtain each client's informed consent, in writing, to the common representation.

76. Even if one is to believe Movant's self-serving description of telephone promises, joint representation is not such a simple matter. Such is particularly true in a case such as the Parker entities, where the corporate form is so blatantly disregarded.

## MOVANT'S RELIANCE ON *BLAU* IS MISPLACED

77. Movant asserts that Ms. Wong is a non-lawyer and cites a case for the proposition that it is appropriate to afford leeway to a "quasi *pro se* litigant", *Blau v. Tom Kestler Design Build Inc.*, 2002 WL 48672 (S.D.N.Y.)

78. That case involved Mr. Schmitt, the sole proprietor of a small architectural firm, who was sued. Schmitt wrote 3 letters to the attorney for the Plaintiff, and got 2 letters back from the Plaintiff's attorney. Schmitt never appeared in the action and was defaulted.

79. The instant case involves a Movant that operates a [4-Star, 731 room hotel](#) in the heart of Manhattan, a [4-Star resort in Palm Springs CA](#) , sitting on a 13 acre estate with 4 swimming pools, which just underwent a $27,000,000 renovation, and various other properties, including the one at issue in this case.

80. To equate a solo architect working on the 11th floor of a building on Bleeker Street with a luxury hotel conglomerate is a stretch: We are reminded of one judge's quip about a party who was "neither uneducated nor unsophisticated despite his attempts in the witness box to appear so," *Timothy's Coffees of the World Inc. v. Switt*, 1996 Ont. C.J. Lexis 2543 at \*16 (Ont. Ct. General Div. 1996).

## MOVANT'S ON *NATIONWIDE V. RANKIN* IS ILLUSTRATIVE OF WHY MOVANT'S CLAIM SHOULD FAIL

81. Movant states that this Circuit grants vacatur where a party reasonably believes they would be defended by an attorney, and cites *Nationwide Mut. Fire Ins. Co v. Rankin*, 199 F.R.D.498 (W.D.N.Y. 2001)

82. *Rankin* involved the application of NY Insurance Law §3420(d) and the issuance of 3 written letters to Mr. Rankin, the last of which stated

> Nationwide has retained the law form of O'Shea, Reynolds and Cummings…to defend you in this matter…it would be in you [sic] best interest not to discuss the case with anyone except a representative of this company or an attorney from [O'Shea, Reynolds], Id. at 501

83. The facts of *Rankin* do not even come close to the self-serving statements of Movant.

84. Moreover, in the context of an insurance contract, there are specific aspects of jurisprudence unique to that sector; the very nature of an insurance contract is to provide for defense and indemnification.

85. That is well-settled law in this state, *Goldberg v. Lumber Mut. Cas. Ins. Co. of N.Y.*, 77 N.E.2d 131, 32-33 (1948); therefore to rely upon any insurance defense case law in a different context is problematic.

## THIS COURT MAY PROPERLY GRANT THE MOTION TO VACATE OR MODIFY THE DEFAULT JUDGMENTS, BUT ON GROUNDS OTHER THAN STATED BY MOVANT

86. The reason why this Court should vacate the Order regarding the portable ramp (Dkt. 36) has nothing to do with the reason set out by Movant.

87. Rather, this Court should vacate that Order because

   a. it is impossible to comply with unless the business is destroyed, and

   b. because there was no consideration of the predicate requirement of the CFR (and there having been raised no *Chevron* issue [467 U.S.837 (1984)]),

   c. as we explained previously (Dkt. 54-2 at page 5/18 thru 9/18)

88. The Court should vacate the Order regarding attorney fees (Dkt. 39) not for any of the logic enunciated by Movant, but rather because the attorney fee-shifting award is based on statute, and there is US Supreme Court case law which is unequivocal, on-point, and un-rebutted by <u>any</u> of the parties to this action.

## THE OCTOBER 12 E-MAIL IS NOT SUBJECT TO ANY CLAIM OF PRIVILEGE

89. Movant states (Dkt. 77, page 12/19):

> In response to a request by Ms. Wong for an update, Mr. Steinberg sent an e-mail on October 12, 2012 to *both* Defendant Abid and Ms. Wong, which discussed the merits of Plaintiff's claims for injunctive relief and a legal strategy for responding. [cite] This was part of the course of conduct that induced Ms. Wong into believing that Defendant Abid would defend Parker East.

90. The only email which **ABID** was able to locate sent on October 12 is one sent at 11:24am.

91. In that email, Ms.Wong is cc'd.

92. The email begins with the salutation "Kais:" and goes on to say in substance that an architect needs to visit the site and make an evaluation.

93. That is hardly a secret, it is a logical action and in fact during the course of this litigation, your Affirmant has spoken with *opposing counsel* about the problems with making any modifications, and what our evaluation revealed.

94. The email then notes that if Abid is unable to retain a competent architect, "perhaps Ms. Wong knows of someone who would be suitable."

95. That is hardly a secret, and it is logical that a top executive of the Parker Meridien hotel would know of a local architect familiar with ADA remediation.

96. It is also logical that a tenant would keep the landlord agent informed as to any architect visits to discuss modifications, since most leases require the landlord's approval for such work.

97. None of the foregoing would create an attorney-client relationship.

98. After discussing having an architect over to see if there are any possibilities, the email concludes with the sentence "This is quite apart from the legal merits (or lack thereof) in the underlying complaint."

99. So not only does the email not "discuss[] the merits of Plaintiff's claims" ….. **it explicitly states to the contrary.**

100. Unless counsel is speaking of a different email, this is not a communication which contains any matter subject to any assertion of privilege, including common-interest.

## **FRE 408 DOES NOT APPLY TO THE E-MAIL APPENDED TO DOCKET 65**

101. Movant asks (Dkt. 77 page 17/19, numbered pate 13) this Court to strike the final page of Docket 65

102. Movant tells this Court that under FRE 408 "settlement communications are not admissible as evidence." (Dkt. 77 at 18/19)

103. Movant is wrong.

104. Assuming *arguendo* that the communication was between parties and was actually a settlement discussion, counsel is still wrong.

105. As a starting point, we begin with FRE 408 section "(a)."

106. That section is titled "Prohibited Uses" and states:

> Evidence of the following is not admissible—on behalf of any party—either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction…

107. As a threshold matter, we note that the email came from Cynthia Wong of "The Jack Parker Corporation" which has <u>never</u> been a party to this action.

108. At the time the email was sent, **none** of the Parker entities were involved in **any** litigation with the recipient of the email.

109. Next we move on to the part of FRE 408 that says:

    a.    To prove or disprove

    b.    The validity or amount

    c.    Of a disputed claim, or

      d.    To impeach

      e.    By a prior inconsistent statement or

      f. A contradiction

110. The offending communication was not offered to prove or disprove the validity or amount of a disputed claim.

111. The offending communication was not offered to impeach by a prior inconsistent statement or a contradiction.

112. Next we proceed to the language of FRE 408(a)(1):

> [F]urnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim.

113. The offending communication does not furnish anything.

114. The offending communication does not promise or offer anything.

115. The offending communication does not attempt to compromise any claim.

116. Next we proceed to the language of FRE 408(a)(2):

> [C]onduct or a statement made during compromise negotiations about the claim—except when offered in a criminal case and when the negotiations related to a claim by a public office in the exercise of its regulatory, investigative, or enforcement authority.

117. Since the offending statement is not being offered in a criminal case, only the first 11 words would possibly apply in this instance:

      a.    Conduct, or

      b.    A statement

      c.    Made during compromise negotiations

      d.    About the claim

118. The offending statement was not conduct.

119. The offending statement was a statement; to wit, an email.

120. The offending statement was not made during compromise negotiations.

121. The maker of the statement did not have any legal claim pending against the recipient of the statement.

122. We next move on to FRE 408(b), which is titled "Exceptions" and states:

> The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

123. The enumerated exceptions are not all-inclusive, and indicate that such is at the discretion of the Court. This is in contrast to the "Prohibited Uses" clause, which is highly specific.

124. In the instant case, the 2 sentence email was not submitted as part of the case-in-chief.

125. Rather it was submitted in connection with a response to the Court ordering us to provide on-point case law relating to our motion practice involving a default judgment issued against a third party.

126. In our response, we relied heavily on *jus tertii* jurisprudence.

127. *Jus tertii* is highly fact-specific.

128. Essentially the offending document was submitted (as part of Dkt. 66) to demonstrate that the third-party (who was no longer a party to the litigation) was putting pressure on a party to the litigation, and that the nature of such pressure was relevant to a claim made on the basis of *jus tertii*.

129. The *Committee Notes On Rules—2006 Amendment* explicitly states:

> The intent is to retain the extensive case law finding Rule 408 inapplicable when compromise evidence is offered for a purpose other than to prove the validity, invalidity, or amount of a disputed claim [string cites omitted]

130. The *Committee Notes On Rules—2011 Amendment* reinforces this point:

Rule 408 previously provided that evidence was not excluded if offered for a purpose not explicitly prohibited by the Rule. To improve the language of the Rule, it now provides that the court may admit evidence if offered for a permissible purpose. There is no intent to change the process for admitting evidence covered by the Rule. It remains the case that if offered for an impermissible purpose, it must be excluded, and if offered for a purpose not barred by the Rule, its admissibility remains governed by the general principles of Rules 402, 403, 801 etc.

### MOVANT'S RELIANCE ON *FOSTER* IS MISPLACED

131. Movant relies on *Foster v. WNYC-TV*, 1989 WL 146277 (S.D.N.Y).

132. In *Foster*, the defendants, by their counsel (the legendary Floyd Abrams) filed a motion to dismiss.

133. Plaintiffs filed opposition, and in so doing they attached as Exhibits 2 thru 6 "letters of settlement" Id. at *6

134. Judge Keenan ordered the letters stricken, and added: "said exhibits have not been considered in this Court's determination" Id.

135. The instant motion does not have any relationship to Foster.

    a. There were no "letters of settlement"
    b. The communication was between a non-party and a party
    c. The communication did not propose or offer to "settle" anything
    d. The communication was not even offered for purposes of a court "making a determination" but rather in explanation of a specific directive of the court to demonstrate standing.

136. Given that standing is an Article III prerequisite, this Court's directive was an entirely proper exercise of this Court's gatekeeping role.

137. Movant notes the *Foster* court's discussion of sanctions.

138. The followup litigation before Judge Keenan is at 1990 WL 63802, and her admonition is well-taken by all parties to the instant case:

> [C]laims must be researched and well-founded in the law before they are brought, in order to avoid vexatious harassment of a party… [E]very action filed must be responded to, therefore attorneys' fees are incurred and court time is wasted in dealing with a non-meritorious claim. *Foster v. WNYC-TV*, 1990 WL 63802 at *2 (S.D.N.Y.)

139. While we do not seek sanctions against Movant, perhaps in the future counsel might actually read the plain language of FRE 408 before making a motion based on it.

For these reasons, we respectfully seek

- that the Motion be denied as regarding the emails,
- granted with regard to the default judgments but on other grounds and only to the extent that the judgments conflict with Supreme Court case law and the Code of Federal Regulations, And in addition, any and all other relief that the Court shall deem appropriate under the circumstances.

Fort Lee, New Jersey, March 18, 2013

**Law Firm of Barry N. Frank & Associates PC**
*Attorneys for the Defendant, Kais Abid*
BY: ____/s/ Barry N. Frank, Esq.
440 West Street, 3rd Floor
Fort Lee, New Jersey  07024
201-461-2500